BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Daniel E. Birkhaeuser (State Bar No. 136646)
dbirkhaeuser@bramsonplutzik.com
Robert M. Bramson (State Bar No. 102006)
rbramson@bramsonplutzik.com
2125 Oak Grove Road, Suite 120
Walnut Creek, California  94598
Telephone: (925) 945-0200

*Attorneys for Plaintiffs*
[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| DALIA ZATLIN, BETH CRANDELL, CLARISSA SIMON, KENDALL MARTIN, RODRIGO SAPLA, REBECCA DAVIS, THOMAS MCMANUS, KIMBERLY SCAVONE, MELISSA JU, and CHRIS THOMPSON on behalf of themselves and all others similarly situated, | No. |
| | |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT** |
| v. | |
| QUALCOMM INCORPORATED, a Delaware Corporation, | **(Jury Trial Demanded)** |
| Defendant | |

Plaintiffs, by and through their undersigned attorneys, bring this proposed class action and, based on information and belief, allege as follows:

## I.     INTRODUCTION

1.     In every cell phone there is a piece of technology known as a baseband processor, also called a "chip," "chipset," or "modem," which enables the phone to communicate with the carrier's network.   Qualcomm Incorporated ("Qualcomm") is the dominant supplier of baseband processors and a licensor of patents that Qualcomm has declared essential to many cellular devices. For nearly a decade, Qualcomm has unlawfully maintained its monopoly in the baseband processor market by engaging in exclusionary conduct that reduces competition and allows it to extract exorbitant royalties.

2.     To function, the baseband processor must conform to certain standards that ensure compatibility with the network.  These standards are established by Standard Setting Organizations ("SSOs"), which are composed of manufacturers and other interested parties that collaborate to set technology requirements to ensure interoperability among all system components.  Qualcomm contrib7uted to the development of various cellular standards and holds numerous related standard-essential patents ("SEPs").  At the time these standards were adopted, Qualcomm committed to license SEPs to all applicants on fair, reasonable, and non-discriminatory ("FRAND") terms.

3.     Qualcomm has used its monopoly power to require phone manufacturers (i.e., downstream customers) to license the SEPs on onerous terms.  Specifically, under a policy called "no license-no chips," Qualcomm withholds its baseband processors unless the phone manufacturer ("original equipment manufacturer" or "OEM") accepts Qualcomm's unreasonable licensing terms. OEMs are forced to either submit to Qualcomm's demands or face supply disruptions that may cripple the manufacturer's business.  Further, the risk of supply disruption deters OEMs from challenging Qualcomm's licensing terms in court, meaning that Qualcomm's licensing agreements and the company's failure to meet its FRAND obligations have largely been shielded from judicial scrutiny.

4.     The terms of the Qualcomm licenses themselves are harmful to competition.  Under these licensing agreements, Qualcomm requires OEMs to pay excessive royalties on any phone that uses a baseband processor produced by its competition. As the Federal Trade Commission ("FTC") wrote in its recently filed complaint, "Qualcomm in effect collects a 'tax' on cell phone manufacturers when they use non-Qualcomm processors. This tax weakens Qualcomm's competitors, including by reducing demand for their processors, and serves to maintain Qualcomm's monopoly in baseband processor markets." [1]

5.     In addition, Qualcomm has used its market position to force major OEMs like Apple into exclusivity agreements.  Such arrangements further protect Qualcomm's market share and hinder the ability of its competitors to grow.

6.     Qualcomm's monopoly power has enabled it to extract unreasonable rates both for its chipsets as well as licenses of its patents.  In the end, consumers of cellular devices are the ones who foot the bill for Qualcomm's anticompetitive conduct.

7.     Plaintiffs bring this action on behalf of themselves and others similarly situated to recover for their injuries from Qualcomm's violation of Sections 2 and 3(b) of the Sherman Act, as well as violations of state antitrust and consumer protection laws.  Plaintiffs and the Class members seek monetary damages, injunctive relief, and any other available remedies as a result of Qualcomm's unlawful conduct.

## II.     PARTIES

### A.  Plaintiffs

8.     Plaintiff Dalia Zatlin is a resident of San Mateo County, California.  During the Class Period, Dalia Zatlin purchased an Apple iPhone 6 for her own use and not for resale.

9.     Plaintiff Beth Crandell is a resident of Phoenix, Arizona.  During the Class Period, Beth Crandell purchased an Apple iPhone 6 for her own use and not for resale.

10.     Plaintiff Clarissa Simon is a resident of the District of Columbia.  During the Class Period, Clarissa Simon purchased an Apple iPhone 6s for her use and not for resale.

---

[1] *FTC v. Qualcomm Inc.*, 17-cv-00220 at 3, Dkt No. 1 (N.D. Cal. Jan. 17, 2017).

11.     Plaintiff Kendall Martin is a resident of Beverly Hills, Florida.  During the Class Period, Kendall Martin purchased one or more Apple iPhone 7's for her own use and not for resale.

12.     Plaintiff Rodrigo Sapla is a resident of Lee County, Florida.  During the Class Period, Rodrigo Sapla purchased an Apple iPhone 4 and Samsung Galaxy S6 for his use and not for resale.

13.     Plaintiff Rebecca Davis is a resident of Oakland County, Michigan.  During the Class Period, Rebecca Davis purchased an Apple iPhone 4S and an Apple iPhone 6 for her use and not for resale.

14.     Plaintiff Thomas McManus is a resident of Manhasset, New York.  During the Class Period, Thomas McManus purchased two Apple iPhone 7'S and one Samsung 7s for his own use and not for resale.

15.     Plaintiff Kimberly Scavone is a resident of Clayton, North Carolina.  During the Class Period, Kimberly Scavone purchased an Apple IPhone 6 for her own use and not for resale.

16.     Plaintiff Melissa Ju is a resident of Pitt County, North Carolina.  During the Class Period, Melissa Ju purchased an Apple iPhone 7 for her own use and not for resale.

17.     Plaintiff Chris Thompson is a resident of Sandy, Utah.  During the Class Period, Chris Thompson purchased one or more iPhone 6's for his own use and not for resale.

**B.  Defendant**

18.     Defendant Qualcomm is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm develops, designs, licenses, and markets its digital communications products and services worldwide, primarily through its two main business segments: Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL"), both wholly-owned subsidiaries of Qualcomm. QCT deals with equipment sales while QTL grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio. QCT is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm.

19.     Qualcomm has extensive offices and employees throughout this District, including

in San Francisco, Santa Clara, and Alameda counties,[2] and regularly conducts business here. Many of its licensees are also located in this District.

## III.    JURISDICTION AND VENUE

20.    This action arises under Section 16 of the Clayton Act, 15 U.S.C. § 26, for Qualcomm's violations of Sections 2 and 3(b) of the Sherman Act, 15 U.S.C. §§ 2, 3(b). The Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

21.    Plaintiffs also bring claims under state laws as set forth herein. The Court has supplemental jurisdiction over these pendant state law claims under 28 U.S.C. §§ 1332(d) and 1367. Each of Plaintiffs' state law claims arises out of the same factual nucleus as Plaintiffs' federal law claims.

22.    Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here. Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

## IV.    INTRADISTRICT ASSIGNMENT

23.    Pursuant to the Northern District of California's Civil Local Rule 3-2(c-e), the intradistrict assignment should be to the San Jose Division.  This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred there. Additionally, Qualcomm has offices in Santa Clara and San Jose, and third parties that have information relevant to this action, including leading cellular device manufacturers and Qualcomm competitors, also have offices in Santa Clara County.  As noted above, the FTC also filed a case in the San Jose Division concerning the same practices at issue in this case.

---

[2] Qualcomm, *Offices & Facilities*, https://www.qualcomm.com/company/facilities/offices (last visited Feb. 15, 2017).

1

2

## V.     FACTUAL BACKGROUND

### A.  SSOs, SEPs, and FRAND Obligations

3

4

5

6

7

8

9

10

24.     Interoperability and compatibility are critical for most modern electronic devices.  A wireless network (such as those operated by AT&T, Verizon, and Sprint) must be able to communicate with cellular devices utilizing that cellular network and vice-versa. This interoperability is achieved thanks to a component in each cellular device known as a modem chipset or baseband processor.  These chipsets manage phone radio functions, enabling phones to transmit and receive information, via radio waves, to and from cellular base stations. Base stations, in turn, transmit information to and from telephone and computer networks. It is essential that all components involved in this transmission be able to communicate seamlessly with one another.

11

12

13

14

15

16

17

18

25.     Because of the multitude of possible devices and technologies, device designers, component manufacturers, and others have agreed to uniform standards to ensure the smooth operation of the wireless network and the cellular devices that connect to it. To achieve this, wireless network carriers, chipset manufacturers, cellular device manufacturers, and others have established SSOs, such as the European Telecommunications Standard Institute ("ETSI"), the International Telecommunications Union ("ITU"), the Institute of Electrical and Electronic Engineers ("IEEE"), and, in the United States, the Telecommunications Industry Association ("TIA").

19

20

21

22

23

24

25

26

26.     SSOs collaborate to set technology requirements that ensure mass interoperability among all system components. The technology incorporated into a standard is typically chosen from among different options. Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because it is necessary to comply with the standard. Additionally, technological standards often need to incorporate patented technologies. These are the SEPs discussed previously. To be compliant with the applicable standard, manufacturers of products using the patented technology generally need to license the technology.

27

28

27.     Antitrust law recognizes that, under certain circumstances, collaboration by industry participants can increase innovation, product quality, and consumer choice. For example, in this context, collaboration allows consumers to be confident that cellular devices bought from different manufacturers will operate with each other and with the wireless network that they choose. Similarly, common standards allow component manufacturers, carriers, and others in the industry to invest in technological advancement with confidence that their products will work with wireless networks.

28.     However, standards can pose challenges to device and device component manufacturers and can involve tradeoffs for consumers. For example, a company implementing standards in a product must use certain mandated technologies, even where many viable, and perhaps even superior alternatives exist. Once a standard is adopted, participants begin to make investments tied to the implementation of the standard. Because these participants may face substantial switching costs in abandoning initial designs and substituting a different technology, an entire industry can become "locked in" to a standard.

29.     The adoption of SEPs into technological standards also enhances the potential for abuse by the patent owner. "Patent hold-up" occurs when a SEP holder demands excessive royalties after companies are locked in to using a standard. Where standardized technologies are covered by patents, companies that choose to implement a standard in their products have no choice but to license those patents (and accept the licensor's terms) or face a lawsuit if they use the technology without a license.  "Royalty stacking" arises when a standard implicates numerous patents. These royalty payments "stack" on top of each other and, in turn, inflate the cost of the product to the consumer. Royalty stacking can be a significant concern:

> The data show that royalty stacking is not merely a theoretical concern.  Indeed, . . . we estimate potential patent royalties in excess of $120 on a hypothetical $400 smartphone—which is almost equal to the cost of  device's components.   Thus, the smartphone royalty stack across standardized and non-standardized technology is significant, and those costs may be undermining industry profitability—and, in turn,

diminishing incentives to invest and compete.[3]

30.    To help alleviate these potential concerns, before agreeing to a particular standard, SSOs seek certain assurances from patent owners. Specifically, SSOs request that SEP holders agree to license their patents on fair, reasonable, and non-discriminatory terms, referred to as a SEP holder's FRAND obligations.  The IEEE asks SEP holders to pledge that they will grant licenses to an unrestricted number of applicants on "reasonable, and nondiscriminatory" terms.  If a patent holder does not choose to make this promise, the SSOs select a standard without using the patented technology.

31.    FRAND obligations are designed to, among other things, prevent SEP holders from wielding control over essential technology and restricting competition, development, and research related to the standard.  SEP holders generally agree to FRAND terms because SSOs may otherwise exclude the holder's technologies from the standard. SEP holders also benefit from license fees and royalties they gain from cooperating with the SSO.

32.    The TIA has explained this point[4]:

Market-driven Open Standards can help promote competition and innovation. Such standards are developed or ratified through a voluntary, open and consensus-based process.

This process is defined by flexible policies that balance incentives to participate in and contribute to the formulation of standards. This process benefits users and consumers by the broad implementation of the resulting standards. One element of a voluntary, open and consensus-based process addresses the inclusion of patented technologies. The patent policies of standards organizations typically find a balance among differing interests. For example, implementers need to access and use patented technology included in the standard. Patent holders need to preserve their rights in a way that encourages them to contribute their innovative solutions to the standardization effort. "RAND" patent policies seek to provide this type of balance

---

[3] Joseph J. Mueller & Timothy D. Syrett, *The Smartphone Royalty Stack: Surveying Royalty Demands for the Components within Modern Smartphones* (May 29, 2014), https://www.wilmerhale.com/pages/publicationsandnewsdetail.aspx?NewsPubId=17179872441.

[4] TIA, *Approved 20 June 2008 by the Intellectual Property Rights Standing Committee of the TIA; TIA – A Leading Developer of Open Standards*, tiaonline.org (June 20, 2008), http://www.tiaonline.org/standards/about/documents/TIA-IPR_20080620-003_TIA_OPEN_STANDARDS-CLEAN_R4.pdf.

by helping to make that patented technology available to all on "reasonable and non-discriminatory" (i.e., RAND) terms and conditions.

33.     As the United States Court of Appeals for the Third Circuit has also noted in a case against Qualcomm:

> [A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard. Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

34.     When a SEP holder makes a FRAND promise to a SSO, implementers of the standard and their customers are third-party beneficiaries of that promise. FRAND obligations are more than a matter of a private contract between owners of technology, on the one hand, and SSOs and their other members (and implementers of the standard as intended third party beneficiaries), on the other. Instead, they are a critical precondition for antitrust tolerance of the industry collaboration on which standard-setting depends.

**B.  The Cellular Industry and Qualcomm's Dominance and Abuse of Power**

35.     Mobile devices are configured for a particular carrier, like AT&T or Verizon, and thus chipsets designed for a particular wireless device must conform to the standard technology chosen for the carrier's associated network. Chipsets that comply with a given standard are not substitutes for chipsets that comply with other standards.  These chipsets likewise have different price and demand characteristics.  Downstream consumers purchase cell phones that include chipsets configured to operate using the standards chosen for a particular network, and once purchased, those consumers are inextricably tied to that standard for use of that device.

36.     Wireless standards have evolved in distinct generations, as consumers demanded more features and the industry responded by developing new innovations.  The following graphic, created by Qualcomm, shows the evolution of this technology.[5]



37.     For purposes of this case, following the first generation of cellular technology, the cellular industry developed second generation ("2G") cellular technology, from which two primary technology paths, or families of standards, emerged: (1) CDMA, which stands for "Code Division Multiple Access" and (2) "GSM," which stands for "global system for mobility." CDMA is a channel access method used by various radio communication technologies. It provides multiple access, where several transmitters can send information simultaneously over a single communication channel. CDMA is used as the access method in many mobile phone standards. GSM, an access method widely used in Europe and much of Asia, utilizes a time division multiple access technology. Wireless network carriers generally operate under one or the other path, with, for example, Verizon and Sprint operating CDMA-path networks, and AT&T (formerly Cingular) and T-Mobile operating GSM-path networks. The CDMA and GSM technology paths are not interoperable; in other words, equipment and technologies designed to be compatible with one standard cannot be used with the other standard.  Qualcomm controlled a number of patents that are essential to the CDMA standard.

38.     The third generation ("3G") of cellular technology was developed in the late 1990s.

---

[5] Qualcomm, *The Evolution of Mobile Technologies-1g-2g-3g-4g-lte*, (June 2014), https://www.qualcomm.com/media/documents/files/the-evolution-of-mobile-technologies-1g-  to-2g-to-3g-to-4g-lte.pdf.

As with the prior generation of cellular technology, 3G evolved into two competing standards—but this time, both major standards were based on CDMA. These standards were (1) an improved version of CDMA technology, and (2) the Universal Mobile Telecommunications Service ("UMTS") standard. Qualcomm had a smaller share of SEPs related to the UMTS and 3G-CDMA standards than its share of the 2G-CDMA SEPs. That being said, 3G products function in combination with 2G technology, meaning the two technologies are often simultaneously deployed in products.

39.     The fourth generation of cellular technology ("4G"), which was first introduced in 2009, brought with it the Long Term Evolution of UMTS, also known as "LTE." Nearly all cellular-enabled devices sold today support LTE for 4G service. The LTE standard does not implement CDMA-based technologies. However, Qualcomm holds a share of SEPs for the LTE standard that is roughly equivalent to that of other industry competitors. One study of declared LTE SEPs found that Qualcomm had a 13% share of "highly novel" essential LTE patents, compared to 19% for Nokia and 12% for both Ericsson and Samsung. Further, 3G and 4G technology are often used in tandem through "multimode" chipsets that are compatible with both sets of standards (as well as 2G standards).

C.  **Qualcomm's Monopoly Power in the CDMA and LTE Chipset Markets**

40.     Qualcomm holds a monopoly position in the CDMA baseband processor market as well as the LTE baseband processor market. As the FTC alleges, Qualcomm's market power is evidenced by "Qualcomm's ability to use threatened loss of access to baseband processors to raise the all-in prices of baseband processors, prices that include both nominal processor prices and license fees."

41.     Further, Qualcomm's market power is evidenced by its market shares. As a result of Qualcomm's pioneering the development of CDMA, it controlled, and continues to control, the market for such technology, initially selling 90% of the CDMA- chipsets and continuing to control over 80% of the market. Further, Qualcomm has used its CDMA market power, as well as its SEPs as leverage to gain market share in the LTE chipset market. Even though Qualcomm held

relatively few SEPs for the LTE standard, in 2015 it controlled nearly 70% of the LTE chipset market.  And Qualcomm exclusively supplies multimode CDMA-LTE chipsets that are backward compatible with CDMA.[6]

## VI.    QUALCOMM HAS ENGAGED IN MONOPOLISTIC AND ANTICOMPETITIVE BEHAVIOR

42.    Qualcomm has used its dominance in the chipset market and its SEPs in combination with each other to maintain and even strengthen its market power, as well as extract exorbitant royalties.  Specifically, it has engaged in three forms of anticompetitive conduct, which "organically connect" to form an anticompetitive business model.[7]

### A.    Qualcomm Refuses to License Its SEPS to Competitors

43.    Qualcomm has flatly refused to license its SEPs to competitors, in violation of its FRAND obligations.  As the Korea Fair Trade Commission ("KFTC") recently found when it imposed against Qualcomm its largest ever fine, several of Qualcomm's competitors, such as Samsung, Intel, and VIA, had requested license agreements. But Qualcomm refused.  By not providing a license to its competitors, Qualcomm makes it necessary for any OEM using a competitor's chipset to obtain a license from Qualcomm.  Otherwise they are subject to a patent infringement suit by Qualcomm.

### B.    Qualcomm Coerces OEMs into Accepting Qualcomm's Licensing Terms

44.    Qualcomm uses its market power in the chipset market to coerce OEMs into accepting licenses on Qualcomm's terms.  As the FTC explained in its complaint, Qualcomm has adopted a policy of "no license-no chips."  Under this policy, Qualcomm makes OEMs' access to its baseband processors conditional on the OEMs' acceptance of Qualcomm's licensing agreement. As the KFTC explicitly found, Qualcomm has "actually used the threat of terminating the supply of

---

[6] Many of the 4G-based cellular devices still implement CDMA-based technology to be backwards-compatible with other CDMA-based technologies that are still in use today.

[7] *See* KFTC Issued Press Release Dated December 28, 2016 – Unofficial English Translation, p. 7, https://www.qualcomm.com/documents/kftc-issued-press-release-dated-december-28-2016- unofficial-english-translation (last visited Feb. 16, 2017)

modem chipsets as **negotiation leverage** in the process of license negotiations with handset companies." (Emphases in original).[8]  This threat would be of little significance if Qualcomm were licensing its competitors.  But all of the major OEMs rely on Qualcomm to supply some of their chipsets.  Since a disruption in chipset supply could force OEMs to shut down their entire business, or at least a significant portion of it, OEMs generally must accede to Qualcomm's terms.[9]

45.     Further, the no license-no chips policy deters OEMs from seeking judicial determinations of what an appropriate FRAND rate should be as well as whether a competitor's chipset infringes on Qualcomm's SEPs.[10]  Namely, to challenge Qualcomm's licensing scheme or to assert non-infringement of Qualcomm's SEPs, an OEM risks having its supply of chipsets cut off—a potentially ruinous result.

C.  **Qualcomm's Licensing Terms Are Anticompetitive and Designed to Preserve Qualcomm's Monopoly Power**

46.     Qualcomm requires OEMs to acquiesce to licensing terms which are harmful to competition and have helped Qualcomm maintain its monopoly power in a number of ways.  To begin with, the licensing terms impose a "tax" on the use of competitors' chipsets.  Specifically, OEMs are forced to pay incremental royalties to Qualcomm on any cellular devices using non-Qualcomm chips.  Per the FTC's complaint, "the royalties that OEMs pay Qualcomm on handsets using non-Qualcomm baseband processors do not reflect OEMs' assessments of patent royalties that a court or neutral arbiter would deem reasonable, including in light of Qualcomm's FRAND commitments."  This licensing term raises the cost for OEMs to use competitors' chips, thereby reducing demand for competitors' chips as well as their ability and incentive to invest and innovate.  And by raising the costs for OEMs to use a competitor's chips, Qualcomm has been able

---

[8] *Id.* at 6.

[9] *Id.* at 12.

[10] *See, e.g. Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-3451-RMW, 2014 WL 2738226, at *6 (N.D. Cal. Aug. 16, 2014) ("The court hereby enters declaratory judgment that, upon Realtek's request for a license, to be in compliance with its RAND commitment, LSI must offer Realtek a license to the '958 Patent on RAND terms, including a royalty rate of 0.12% on the total sales of Realtek's products."); *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. April 25, 2013), *aff'd*, 795 F.3d 1024 (9th Cir. 2015) (determining reasonable rate for licensing Motorola's patents;

to raise the price of its own chips without fear of being underpriced by a competitor.  Notably, "Qualcomm is unique in requiring an OEM, as a condition of sales, to secure a separate patent license requiring royalty payments for handsets that use a competitor's components."

47.    Furthermore, Qualcomm requires OEMs to cross-license their own patents to Qualcomm for free.  These cross-licenses enable Qualcomm to provide what is known as a "patent umbrella" to purchasers of its chips.  Specifically, "[w]hen an [OEM] purchases chipsets from Qualcomm, it can benefit from the patent umbrella effect whereby it is exempted from having to pay royalties to around 200 other patent holders."[11]  Conversely, if an OEM purchases chips from one of Qualcomm's competitors, the OEM must pay royalties for these patents.  The effect of this practice is to lower the all-in cost of Qualcomm's chips compared to chips produced by a competitor, thereby giving Qualcomm a competitive advantage that helps it (1) preserve its market share, and (2) raise its own chip prices without fear of being underbid.

48.    Finally, in at least one instance, Qualcomm has coerced an OEM—Apple, one of the largest cell phone manufacturers—to exclusively use Qualcomm chips.  As the FTC explained in its recently-filed complaint, since 2007, Apple has entered into agreements to deal exclusively with Qualcomm in exchange for partial relief from Qualcomm's standard royalties.  Samsung has also entered into a similar exclusive dealing arrangement with Qualcomm.[12]  Qualcomm's exclusive supply arrangements with these device manufacturers denies other modem chipset suppliers the benefits of working with those manufacturers and hampers their development into effective competitors.

## VII.    QUALCOMM'S BEHAVIOR HAS REDUCED COMPETITION IN THE CDMA AND LTE BASEBAND PROCESSOR MARKETS

49.    In 2008, Qualcomm had ten other major chipset manufacturers that competed with it.  Since then, the baseband processor market has doubled in size—from $10 billion in revenue per

---

[11] *See supra* note 7 at 9.

[12] Joel Hruska, *Qualcomm may have inked exclusive deal to put Snapdragon 820 in Samsung hardware*, ExtremeTech.com (Dec. 21, 2015) https://www.extremetech.com/mobile/219791-qualcomm-may-have-inked-exclusive-deal-to-put-snapdragon-820-in-samsung-hardware.

year to $20 billion in revenue per year.  However nine of Qualcomm's competitors have exited the market.  According to the Korean Fair Trade Commission, the Herfindahl- Hirschman index for the baseband processor market has increased from 2,224 in 2008 to 4,670 in 2014. The 4G LTE baseband processor market has gone from moderately concentrated to extremely concentrated in that period of time. The KFTC prepared the following chart that demonstrated Qualcomm's incredible success in driving its competitors from the baseband processor market.



50.     Given the substantial increase in industry revenue, the decrease in the number of manufacturers can only be explained by Qualcomm's anticompetitive conduct making it too difficult for these manufacturers to compete.

## VIII.   QUALCOMM'S ANTICOMPETITIVE LICENSING PRACTICES INFLATE THE PATENT ROYALTIES THAT IT COLLECTS ABOVE COMPETITIVE RATES

51.     This dominance in the chipset market, coupled with its ownership of critical SEPs built into several of the standards adopted by various SSOs, allowed Qualcomm to impose onerous license terms on device manufacturers, including supracompetitive royalties that are inconsistent with its FRAND obligations.

52.     To begin with, Qualcomm refuses to license its SEPs individually.  Instead it requires OEMs to license its entire patent portfolio, which includes many non-essential patents.  By licensing its entire portfolio, Qualcomm seeks to sidestep its FRAND obligations (as FRAND obligations do not apply to non-SEPs) and to justify charging exorbitant royalties.

53.     And Qualcomm's royalties certainly are exorbitant. Unlike other SEP licensors, Qualcomm's royalties "are generally based upon a *percentage of the* wholesale (i.e., licensee's) selling price of complete licensed products, net of certain permissible deductions (including transportation, insurance, packing costs and other items)." (Emphases added). Using the entire value of an end product is not a reasonable basis for calculating SEP-based royalties. As Apple has pointed out in its complaint, that rate base is calculated as a percentage of the value that Apple's own research, development, and innovation created in successive generations of iPhones. Indeed, around February 8, 2015, the IEEE updated its licensing policy, stating that a reasonable royalty should be the value attributable to a SEP, excluding the value of that SEP's inclusion in an IEEE standard, and that a factor to consider when determining the reasonable rate is the value of the relevant functionality of the smallest salable compliant implementation that practices the essential patent claim.[13]

54.     Industry analysts have estimated that Qualcomm's patent royalties earn it 3-5% of the total wholesale price of each cellular device sold, meaning that Qualcomm could be receiving as much as $45 in royalties per phone, despite the fact that Qualcomm's patents comprise a much smaller fraction of the value of the phone.  As the following chart shows, these royalty rates are substantially higher than those of other SEP licensors.

| Company | Announced LTE Rates | No. of Essential LTE Patents |
|---|---|---|
| 1. Qualcomm | 3.3% | 350 |
| 2. Huawei | 1.5% | 182 |
| 3. Ericsson | 1.5% | 146 |
| 4. Nokia | 1.5% | 142 |
| 5. Nortel | 1.0% | 46 |
| 6. Siemens | 0.8% | 32 |
| 7. Motorola | 2.3% | 16 |
| 8. Alcatel | 2.0% | 9 |

Source: Stasik, Eric, "Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunication Standards." *les Nouvelles*, September 2010, p. 116.

---

[13] Deepa Sundararaman, *Inside The IEEE's Important Changes To Patent Policy*, Law360 (Apr. 3, 2015), https://www.law360.com/articles/637457/inside-the-ieee-s-important-changes-  to-patent-policy.

55.     The unfairness and supracompetitive nature of Qualcomm's rates is further demonstrated by the fact that Qualcomm's rates have not changed despite the growth of other value-contributing features, such as better displays, processors, and cameras, as well as the expiration of a number of Qualcomm's SEPs.  In sum, Qualcomm has been able to use its market power to extract royalty rates that are divorced from the actual value attributable to Qualcomm's technologies.

56.     Finally, Qualcomm's license agreements require OEMs to pay royalties based on the price of the device as a whole even when the OEM purchases a Qualcomm chip.  When every other major manufacturer of cell phone components sells a part to an OEM, they include a license to the relevant intellectual property rights as part of that sale.  Qualcomm, however, is the only major manufacturer of a cell phone component—any component—that separately sells the component and the associated intellectual property. This allows Qualcomm to "double-dip" by charging OEMs to purchase the chips from Qualcomm and again to license the SEPs.

## IX.     CONSUMERS ARE HARMED AS A DIRECT RESULT OF QUALCOMM'S CONDUCT

57.     Qualcomm has abused its monopoly power to force device manufacturers and other licensees to pay excessively high royalties, which has directly resulted in harm to Plaintiffs and members of the proposed classes because it resulted in them paying higher prices for their cellular devices than they would have in the absence of Qualcomm's conduct.

58.     Consumers typically buy cellular devices either from the device manufacturer, such as Samsung or Apple, or through their network carrier, such as Verizon or Sprint.

59.     Device manufacturers and network carriers are subject to vigorous price competition, and as a result, they do not absorb Qualcomm's unlawful royalties, which are based on a percentage of the wholesale cost of the device itself. Instead, they pass along some, or all, of the excessive royalty to consumers.  For instance, baseband processors cost as little as $10 to $13, but royalty demands associated with this component can approach $60 for a $400 smartphone.[14]

---

[14] *See* Don Clark, *Qualcomm's Main Profit Driver is Under Pressure*, The Wall Street Journal (Apr. 13, 2015), http://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051.  ; *see*

This disparity between royalty demands and component costs results in increased costs for cellular devices, which are directly passed on to the consumer.

60.    Plaintiffs and members of the proposed classes have been forced to pay supra-competitive prices for cellular devices.  As Qualcomm bases its royalties on a percentage of the wholesale selling price of a complete licensed product, purchasers of cellular devices are only one level removed from the unlawful overcharge at issue here.

61.    Economic and legal scholars have recognized that unlawful overcharges are passed down the distribution chain.  Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the *Handbook of the Law of Antitrust*) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[15]

62.    The FTC concurs in its complaint. It states at paragraph 1 of its complaint that "Qualcomm has engaged in exclusionary conduct that taxes its competitors' baseband processor sales, reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for cell phones and tablets."

63.    If Qualcomm were forced to stop abusing its monopoly power and charge a fair and reasonable royalty, consumers would receive better prices when purchasing cellular devices.

64.    The precise amount of the overcharge impacting the prices of cellular devices purchased by consumers is measureable through commonly accepted statistical and regression modeling.

---

*also* Nomura 2012 Smartphone Guide http://www.patenttoday.com/wp-content/uploads/2014/08/nomura_smartphone_poster_2012.pdf (last visited Feb. 15, 2017),

[15] RG Harris & LA Sullivan, *Passing-On the Monopoly Overcharge: A Comprehensive Policy  Analysis*, 128 U. PA. L. REV. 269, 276 (1979).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## X.  MARKET DEFINITION

65.    The relevant geographic market for purposes of this action is the United States and its territories.

66.    The relevant product markets are: (1) the market for CDMA-based and premium LTE modem chipsets ("Modem Chipset Market"), and (2) the market for intellectual property rights Qualcomm deems essential to the CDMA or LTE standards ("SEP Licensing Market").

67.    Qualcomm directly participates in the market for the sale of the cellular devices to Plaintiffs and proposed class members by encumbering those devices through its licenses and related royalties.  Specifically, Qualcomm's royalty payments are calculated as a percentage of the wholesale price of cellular devices that implement CDMA-based and/or premium LTE technologies (hereafter, the "Relevant Cellular Devices").  And this royalty calculation method increases the retail price of the Relevant Cellular Devices. In other words, Qualcomm licenses technology essential to the operation of cellular devices and obtains monopoly rents tied directly to the entire wholesale price of the Relevant Cellular Devices.  The effect of Qualcomm's anticompetitive conduct is thus targeted at the cellular device as a whole and not components thereof. Accordingly, because Qualcomm royalties are based on the wholesale selling price of complete licensed products, the patent rights owned by Qualcomm are inextricably intertwined with the cellular devices themselves.  As a result, Qualcomm's anticompetitive acts, as alleged herein, directly distorted the price of the cellular devices paid by Plaintiffs.

68.    Relatedly, Plaintiffs and Class members may not use Relevant Cellular Devices without the licenses provided by Qualcomm.

69.    Plaintiffs' injuries are also inextricably intertwined with Qualcomm's anticompetitive conduct with respect to modem chipsets and abuse of patent rights because it has increased the cost to them of purchasing the Relevant Cellular Devices by, among other things, (1) eliminating competition, (2) allowing Qualcomm to charge supracompetitive prices for its chipsets and licenses, and (3) forcing device manufacturers to agree to onerous licensing terms (with unreasonable royalties).

## XI.    CLASS ACTION ALLEGATIONS

70.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2), of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, as well as under Rule 23(b)(3) for monetary relief under California law, on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-based and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

71.    Alternatively to the claim for nationwide monetary relief under California law, Plaintiffs also brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief pursuant to the common law of unjust enrichment and individual state antitrust, unfair competition, and consumer protection laws for each of the states listed below (the "Indirect Purchaser States")[16] on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA-based, and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2011 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

---

[16] The "Indirect Purchaser States" consist of Arizona, Arkansas, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

72.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

73.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of members in each Class.

74.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Qualcomm's conduct to acquire and maintain monopoly power, which was and is generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

- Whether Qualcomm possessed monopoly power over CDMA-based and premium LTE modem chipsets as well as licenses for intellectual property rights essential to the CDMA and LTE standards (collectively the "Cellular Device Components") in the United States during the Class Period;

- Whether Qualcomm possessed monopoly power in the Modem Chipset  Market in the United States during the Class Period;

- Whether Qualcomm willfully acquired or maintained monopoly power in the Modem Chipset Market in the United States during the Class Period;

- Whether Qualcomm attempted to possess monopoly power in the Modem Chipset Market in the United States during the Class Period;

- Whether Qualcomm possessed monopoly power in the SEP Licensing Market in the United States during the Class Period;

- Whether Qualcomm willfully acquired or maintained monopoly power in the SEP Licensing Market in the United States during the Class Period;

- Whether Qualcomm attempted to possess monopoly power in the SEP Licensing Market in the United States during the Class Period;

- Whether Qualcomm tied the sale of its CDMA- and premium LTE- based chipsets to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

- Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

- Whether Qualcomm's acquisition and maintenance of its monopolies in the Cellular Device Components violated Sections 2 and 3(b) of the Sherman Act, as alleged in the First Claim for Relief;

·  Whether Qualcomm's conduct violated California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*., as alleged in the Second Claim for Relief;

·  Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Third through Thirty-Ninth Claims for Relief;

·  Whether Qualcomm unjustly enriched itself to the detriment of Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Qualcomm, as alleged in the Fortieth Claim for Relief;

·  Whether the conduct of Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

·  The appropriate injunctive and related equitable relief for the Nationwide Class; and

·  The appropriate class-wide measure of damages for the Damages Class.

75.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes.  Plaintiff and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid artificially inflated prices for purchased indirectly from Qualcomm.

76.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

77.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

78.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including

providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

79. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## XII.  CLAIMS AND PRAYER FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Sections 2 and 3(b) of the Sherman Act
### 15 U.S.C. §§ 2, 3(b)
### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

80. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

81. Qualcomm's actions in unlawfully and unreasonably to sustain its dominant market share in the chipset market as discussed herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Sections 2 and 3(b) of the Sherman Act (15 U.S.C. §§ 2, 3(b)).

82. Qualcomm has abused and used unfair and anticompetitive means to sustain its dominant position and market power in the market for Cellular Device Components.

83. Throughout the relevant period, Qualcomm has maintained high and durable market shares in the market for Cellular Device Components. Qualcomm controls the CDMA chipset supply, controlling over 80% of the CDMA modem chipset market at all times relevant to this Complaint. At all times relevant to this complaint, Qualcomm has controlled more than 60% of the Modem Chipset Market with its market share reaching over 90% during portions of the relevant period. And Qualcomm still maintains exclusive control over multimode CDMA-LTE chipsets that are backward compatible with CDMA.

84.    Qualcomm maintains large shares in these markets because substantial entry barriers and structural features in the market prevents effective competition. CDMA- and premium LTE-based technology is not interchangeable with or substitutable for other technologies, and users of this technology have become effectively "locked-in" to Qualcomm's technology because their commitment to this technology means no effective and cost-efficient alternatives are practicable.

85.    Further, because Qualcomm controls the patents or SEPs underlying CDMA technology, Qualcomm has been able to maintain this monopoly by, among other things, refusing to license to competitors and requiring chipset purchasers to accept its licensing terms which inhibit competition. Similarly, Qualcomm's power in this markets is shown by and enhanced by its ability as the dominant player in the market to force device manufacturers to accept one-sided, unreasonable supply terms. Among other things, Qualcomm has used its control over the CDMA chipset supply to require purchasers to agree to its license agreements and related terms, including excessively high royalties and other terms Qualcomm unilaterally sets.

86.    Qualcomm also has monopoly power over the SEP Licensing Market. SSOs have selected standards based on technology for which Qualcomm owns the patents (based on the condition that Qualcomm would supply its technology on FRAND terms). As to market share, Qualcomm holds virtually all of the SEPS—the essential patents—for CDMA standard-based technologies, which underlie virtually all 3G devices and 4G-LTE devices which are 3G-compatible. Qualcomm has licensed its patent portfolio for 3G cellular devices to more than 200 licensees. As these patents are "essential" to the CDMA standard, other patents and patented technology cannot replace or serve as an alternative for Qualcomm's patents. Qualcomm's market power over the SEP Licensing Market is further demonstrated Qualcomm's ability to leverage its control of its patents to force OEMs to agree to unfair and unreasonable license agreements and terms, including excessive royalties. Because OEMs need to use Qualcomm's technology for their devices to communicate with the major carrier networks, they are forced to agree to Qualcomm's unfair and unreasonable licensing terms.

87.     Thus, Qualcomm's actions have resulted in the acquisition and maintenance of its market power over Cellular Device Components. These means with which Qualcomm has acquired and maintain such market power, including excluding competitors and forcing OEMs to agree to non-FRAND terms are blatantly anticompetitive means.

88.     Qualcomm also has illegally maintained its market power in the SEP Licensing Market. SSOs selected standards based on Qualcomm technology on the condition that Qualcomm would supply its technology on FRAND terms. Thus, Qualcomm holds virtually all of the SEPS— the essential patents—for CDMA standard-based technologies, which underlie virtually all 3G devices and 4G-LTE devices. These patents are "essential" to the relevant CDMA standards, meaning that other technology cannot replace or serve as an alternative for Qualcomm's technology. While Qualcomm has licensed its patent portfolio for 3G cellular devices to more than 200 licensees, its market power has enabled it to force OEMs to agree to unfair and unreasonable license agreements and terms, including excessive royalties.

89.     Qualcomm has not licensed its technologies using FRAND terms, but instead has imposed more restrictive and expensive terms on technology licensees and will continue to do so unless restrained and enjoined by this Court.

90.     Thus, Qualcomm has acquired and maintained of its market power in the Cellular Device Components described above through anticompetitive means—among other things, excluding competitors and forcing OEMs to agree to non-FRAND terms.

91.     Qualcomm's market power means it can set terms for using its technology, including royalty rates, without other firms competing to drive down these prices. Specifically, Qualcomm's control over the Cellular Device Components has allowed it to force license agreements on its competitors and OEMs, and its license agreements allow Qualcomm to charge a licensing fee plus ongoing royalties of between three to five percent (3-5%) of the wholesale price of the completed device. In other words, each Relevant Cellular Device sold with or based on Qualcomm technology is also encumbered by Qualcomm's excessive royalties. The excessive royalty rates in turn increase the cost of Relevant Cellular Devices purchased by consumers, such

as Plaintiffs and members of the Classes.

92.      Qualcomm's actions lack procompetitive justification. Qualcomm induced SSOs to set standards based upon Qualcomm's technology by promising to license its technologies consistent with FRAND obligations. By inducing SSO's to use its technologies, SSO did not utilize other (potentially superior) technologies in setting their standards. Qualcomm, however, has effectively repudiated its FRAND obligations by forcing OEMs to accept unfair and unreasonable license terms, including, but not limited to, unreasonable and excessive royalty rates based on the completed device's price rather than the portion of a completed device's value that can be attributable to Qualcomm's technology.

93.      Qualcomm's actions have artificially raised prices for the relevant chipsets to artificially high, non-competitive levels throughout the United States. In addition, it is likely that Qualcomm's actions have stifled new technologies, reducing consumer choice and device quality.

94.      By engaging in this anticompetitive and illegal activity, Qualcomm has injured Plaintiffs and members of the Class injured in their businesses and property by paying more for their mobile devices and having fewer choices when they buy those devices than would have been the case absent Qualcomm's anticompetitive actions. Further, allowing Qualcomm to continue its illegal actions will harm Plaintiffs and Class members in the future as they purchase new devices.

95.      Pursuant to Sections 2 and 3(b) of the Sherman Act and Section 16 of the Clayton Act, Plaintiffs and members of the Classes are thus entitled to a declaration that Qualcomm's actions constitute an illegal abuse of its market power under Section 2 and an injunction requiring Qualcomm cease its unlawful and anticompetitive actions.

## VIOLATIONS OF STATE ANTITRUST LAWS

96.      Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

### SECOND CLAIM FOR RELIEF

### For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*

### (On Behalf of All Plaintiffs)

97.      Plaintiffs repeat the allegations set forth above as if fully set forth herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

98.     During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq.* effectively coercing its customers to agree to unreasonable terms of trade to obtain access to Qualcomm's technology. Despite its FRAND obligations, Qualcomm imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation and had those rates and other terms written into the terms of agreements between itself and its customers, leading to higher prices for Relevant Cellular Devices bought by Plaintiffs and members of the classes. This conduct constitutes a "combination" under the Cartwright Act.

99.     By using its market power to creating agreements designed to artificially inflate prices, Qualcomm established a unlawful and anticompetitive scheme that allowed it to acquire and maintain monopoly power, exclude competition and artificially inflate prices in the Modem Chipset Market and SEP Licensing Market, harming Plaintiffs and members of the Classes by causing them to pay higher prices for their Relevant Cellular Devices than they would have absent Qualcomm's illegal conduct.

100.     The Relevant Cellular Devices are commodities.

101.     As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices.

102.     Because Qualcomm's has its headquarters and principal place of business in California and the relevant illegal conduct flowed from those offices, California law properly applies to Qualcomm's conduct and thus the claims of all Class members. Qualcomm reaped the profits of its illegal activities in California and extracted artificially inflated prices from companies and individuals in California from the licensing of its technology and the sale of mobile devices in the nation's largest consumer market – California. Because Qualcomm knew or was reckless in not knowing the impact of the actions it performed in California, application of California law is appropriate.

**THIRD CLAIM FOR RELIEF**

**Nationwide Claim For Violations of Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200, et seq.**

**(On Behalf of All Plaintiffs)**

103.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

104.    Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., which protects consumers from illegal, fraudulent and unfair business practices.

105.    Plaintiffs bring this claim on behalf of themselves, and the classes, and on behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

106.    Qualcomm unlawfully acquired and maintained its monopoly over the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio. This conduct constitutes violations of the Sherman Act and the Cartwright Act and thus violates Cal. Bus. & Prof. Code § 17200.

107.    Qualcomm acts deceptively by inducing SSOs to use its technology by falsely promising it will license its technologies in accordance with FRAND. But Qualcomm refuses to do so.

108.    Qualcomm's conduct is unfair to Plaintiffs and members of the class because as a direct result of its acts described above, Plaintiffs and members of the Classes were charged more for their Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

109.    Plaintiffs and the Class seek and are entitled to all forms of relief available under California's Unfair Competition Law. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Damages Class seek from Qualcomm restitution and the disgorgement of all earnings, profits, compensation, benefits and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Business & Professions Code § 17200 et seq.

110.   Because Qualcomm's has its headquarters and principal place of business in California and the relevant illegal conduct flowed from those offices, California law properly applies to Qualcomm's conduct and thus the claims of all Class members. Qualcomm reaped the profits of its illegal activities in California and extracted artificially inflated prices from companies and individuals in California from the licensing of its technology and the sale of mobile devices in the nation's largest consumer market – California. Because Qualcomm knew or was reckless in not knowing the impact of the actions it performed in California, application of California law is appropriate.

111.   Pursuant to Business & Professions Code § 17204, Plaintiffs and the Classes seek an order from this Court enjoining Qualcomm from continuing to engage in the acts as set forth in this Complaint, acts that violate Business & Professions Code § 17200 et seq. Plaintiffs, class members and the public will be irreparably harmed if such an order is not granted.

### FOURTH CLAIM FOR RELIEF
### Violation of Arizona's Uniform State Antitrust Act,
### Ariz. Rev. Stat. § 44-1401, et seq
### (On Behalf of the Arizona Class Members)

112.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

113.   By reason of the conduct alleged herein, Qualcomm has engaged in conduct prohibited by Arizona Rev. Stat. § 44-1403. More specifically, Qualcomm's actions established, maintained and used monopoly power to exclude competition and inflate, control or maintain prices for its technology, by establishing, utilizing and maintaining monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, forcing exclusive dealing arrangements on its customers to reduce competition, and forcing OEMs to license its patent portfolio.

114.    Members of the Arizona class purchased Relevant Cellular Devices within the State of Arizona during the Class Period. But for Qualcomm's conduct set forth herein, the price of their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

115.    Qualcomm's violations of Arizona law were flagrant.

116.    Qualcomm's unlawful conduct substantially affected Arizona's trade and commerce.

117.    As a direct and proximate cause of Qualcomm's unlawful conduct, the Plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury because Plaintiffs and members of the class were charged more for their Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

118.    By reason of the foregoing, Plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1408, including appropriate equitable relief, attorney's fees, taxable costs, and damages (including trebled damages).

### FIFTH CLAIM FOR RELIEF

### Violation of the District of Columbia Antitrust Act,

### D.C. Code § 28-4501, et seq.

### (On Behalf of the District of Columbia Class Members)

119.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

120.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

121.    Members of the District of Columbia class purchased Relevant Cellular Devices within the District of Columbia during the Class Period. But for Qualcomm's conduct set forth herein, the price of their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

1    122.    Under District of Columbia law, indirect purchasers have standing to maintain an

2  action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint,

3  because "any indirect purchaser in the chain of manufacture, production or distribution of

4  goods...shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

5    123.    Qualcomm restrained trade in, and monopolized the Modem Chipset Market and

6  SEP Licensing Market through anticompetitive conduct described above, including, among other

7  things, excluding competitors by refusing to license its technology to them, forcing exclusive

8  dealing arrangements on its customers to reduce competition, and forcing OEMs to license its

9  patent portfolio, thus restraining and monopolizing trade in the District of Columbia, in violation of

10  D.C. Code § 28-4501, et seq.

11    124.    Members of the Classes were injured with respect to purchases of Relevant Cellular

12  Devices because they paid more than they would have been but for Qualcomm's conduct and are

13  entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable

14  attorneys' fees and costs.

15                                SIXTH CLAIM FOR RELIEF

16                          Violation of the Illinois Antitrust Act,

17                        740 Ill. Comp. Stat. Ann. 10/3(1), et seq.

18                        (On Behalf of the Illinois Class Members)

19

20    125.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

21  allegation set forth in the preceding paragraphs of this Complaint.

22    126.    The Illinois Antitrust Act, 740 ILCS 10/1, et seq., aims "to promote the unhampered

23  growth of commerce and industry throughout the State by prohibiting restraints of trade which are

24  secured through monopolistic or oligarchic practices and which act or tend to act to decrease

25  competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/2.

26    127.    Class members purchased Relevant Cellular Devices within the State of Illinois

27  during the Class Period. But for Qualcomm's conduct set forth herein, the prices for their Relevant

28  Cellular Devices would have been lower, in an amount to be determined at trial.

128.     Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

129.     Qualcomm's actions illegally created and maintained monopoly power over the relevant markets, artificially inflating prices for Relevant Cellular Devices and excluding competition in the relevant markets, restraining competition within the intrastate commerce of Illinois in violation of 740 ILCS 10/1, et seq.

130.     Members of the Classes were injured with respect to purchases of their Relevant Cellular Devices and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF

### Violation of the Iowa Competition Law

### Iowa Code § 553.1, et seq.

### (On Behalf of the Iowa Class Members)

131.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

132.     The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices," Iowa Code § 553.2, and prohibits "establish[ing], maintain[ing], or us[ing] a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices". Iowa Code § 533.5.

133.     Class members purchased Relevant Cellular Devices within the State of Iowa during the Class Period. But for Qualcomm's conduct set forth herein, they would have paid lower prices for their Relevant Cellular Devices, in an amount to be determined at trial.

134.     Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, forcing exclusive dealing arrangements on its customers to reduce competition, and forcing OEMs to license its patent portfolio, thus

excluding competition and artificially raising prices above competitive levels, in violation of Iowa Code § 553.5, et seq.

135.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**EIGHTH CLAIM FOR RELIEF**

**Violation of the Kansas Restraint of Trade Act**

**Kan. Stat. Ann. § 50-101, et seq.**

**(On Behalf of the Kansas Class Members)**

136.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

137.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

138.    As noted above, Qualcomm used its monopoly power to effectively coerce its customers to agree to unreasonable terms of trade to obtain access to Qualcomm's technology. Despite its FRAND obligations, Qualcomm imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation and had those rates and other terms written into the terms of agreements between itself and its customers, creating combinations that artificially prevented full and free competition in the markets for goods and technology delivered to and sold in Kansas.

139.    By using its market power to creating agreements designed to artificially inflate prices, Qualcomm established a unlawful and anticompetitive scheme that allowed it to acquire and maintain monopoly power, exclude competition and artificially inflate prices in the Modem Chipset Market and SEP Licensing Market.

140.    Class members purchased Relevant Cellular Devices within the State of Kansas during the Class Period. But for Qualcomm's conduct set forth herein, the price of Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

141.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint for actions by an illegal monopoly that injures them. Kan. Stat. Ann § 50-161(b).

142.    Plaintiffs and members of the Class were injured with respect to purchases of Relevant Cellular Devices in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**NINTH CLAIM FOR RELIEF**

**Violation of the Maine's Antitrust Statute**

**Me. Rev. Stat. Ann. Tit. 10 § 1101, et seq.**

**(On Behalf of the Maine Class Members)**

143.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

144.    Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and monopolization of trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

145.    Class members purchased Relevant Cellular Devices within the State of Maine during the Class Period. But for Qualcomm's conduct set forth herein, the price of Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

146.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

147.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing

arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing market for Relevant Cellular Devices within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1102.

148.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

### TENTH CLAIM FOR RELIEF
### Violation of the Michigan Antitrust Reform Act
### Mich. Comp. Laws § 445.771, et seq.
### (On Behalf of the Michigan Class Members)

149.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

150.    The Michigan Antitrust Reform Act aims "to prohibit monopolies and attempts to monopolize trade or commerce...[and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

151.    Class members purchased Relevant Cellular Devices within the State of Michigan during the Class Period. But for Qualcomm's conduct set forth herein, the prices for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

152.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

153.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, thus restraining and monopolizing market for Relevant Cellular Devices, in violation of Mich. Comp. Laws § 445.773, et seq.

154.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

### ELEVENTH CLAIM FOR RELIEF

### Violation of the Minnesota Antitrust Law,

### Minn. Stat. § 325D.49, et seq.

### (On Behalf of the Minnesota Class Members)

155.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

156.    The Minnesota Antitrust Law of 1971 aims to prohibit any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

157.    Members of the Classes purchased Relevant Cellular Devices within the State of Minnesota during the Class Period. But for Qualcomm's conduct set forth herein, the prices for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

158.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

159.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing market for Relevant Cellular Devices in violation of Minn. Stat. § 325D.52.

160.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Minnesota and are entitled to all forms of relief, including actual damages, treble

damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## TWELVTH CLAIM FOR RELIEF

### Violation of the Mississippi Antitrust Statute,

### Miss. Code Ann. § 74-21-1, et seq.

### (On Behalf of the Mississippi Class Members)

161.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

162.     Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

163.     Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

164.     Members of the Classes purchased Relevant Cellular Devices within the State of Mississippi during the Class Period. But for Qualcomm's conduct set forth herein, the prices for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

165.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

166.     As noted above, Qualcomm used its monopoly power to effectively coerce its customers to agree to unreasonable terms of trade to obtain access to Qualcomm's technology. Despite its FRAND obligations, Qualcomm imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation and had those rates and other

terms written into the terms of agreements between itself and its customers, creating combinations that artificially prevented full and free competition in the markets for goods and technology delivered to and sold in Mississippi.

167.    By using its market power to creating agreements designed to artificially inflate prices, Qualcomm established a unlawful and anticompetitive scheme that allowed it to acquire and maintain monopoly power, exclude competition and artificially inflate prices in the Modem Chipset Market and SEP Licensing Market, thus leading to higher prices for the Relevant Cellular Devices purchased by members of the Classes, all in violation of Miss. Code Ann. § 75-21-1(a) and Miss. Code Ann. § 75-21-3, et seq.

168.    Qualcomm's goods and technology are sold throughout the State of Mississippi. During the Class Period, Qualcomm's illegal conduct substantially affected Mississippi commerce.

169.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**THIRTEENTH CLAIM FOR RELIEF**

**Violation of the Nebraska Junkin Act,**

**Neb. Rev. Stat. § 59-801, et seq.**

**(On Behalf of the Nebraska Class Members)**

170.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

171.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

172.    Members of the Classes purchased Relevant Cellular Devices within the State of Nebraska during the Class Period. But for Qualcomm's conduct set forth herein, the prices they paid for the Relevant Cellular Devices would have been lower, in an amount to be determined at

trial.

173. Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

174. Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices within the intrastate commerce of Nebraska in violation of Neb. Rev. Stat. § 59-802, et seq.

175. Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of the Nevada Unfair Trade Practices Act,
### Nev. Rev. Stat. § 598A.010, et seq.
### (On Behalf of the Nevada Class Members)

176. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

177. The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

178. The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat.

1   Ann. § 598A.060.

2       179.    Members of the Classes purchased Relevant Cellular Devices within the State of

3   Nevada during the Class Period. But for Qualcomm's conduct set forth herein, the prices for their

4   Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

5       180.    Under Nevada law, indirect purchasers have standing to maintain an action under

6   NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

7       181.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market

8   through anticompetitive conduct described above, including, among other things, excluding

9   competitors by refusing to license its technology to them, engaging in exclusive dealing

10  arrangements with its customers to keep out competitors, and forcing OEMs to license its patent

11  portfolio, restraining and monopolizing the market for Relevant Cellular Devices within the

12  intrastate commerce of Nevada, violating Nev. Rev. Stat. Ann. § 598A.60(e).

13      182.    Members of the Classes were injured with respect to their purchases of Relevant

14  Cellular Devices in Nevada. Accordingly, Plaintiffs and members of the Nevada Class are entitled

15  to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs,

16  and injunctive relief.

17      183.    In accordance with the requirements of § 598A.210(3), notice of this action was

18  mailed to the Nevada Attorney General by Plaintiffs.

19

20                          **FIFTEENTH CLAIM FOR RELIEF**

21                  **Violation of New Hampshire's Antitrust Statute,**

22                  **N.H. Rev. Stat. Ann. Tit. XXXI, § 356, et seq.**

23                  **(On Behalf of the New Hampshire Class Members)**

24      184.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

25  allegation set forth in the preceding paragraphs of this Complaint.

26      185.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

27  Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H.

28

1    Rev. Stat. Ann. §§ 356:2, 3.

2        186.    Members of the Classes purchased Relevant Cellular Devices within the State of

3    New Hampshire during the Class Period. But for Qualcomm's conduct set forth herein, the prices

4    they paid for their Relevant Cellular Devices would have been lower, in an amount to be

5    determined at trial.

6        187.    Under New Hampshire law, indirect purchasers have standing to maintain an action

7    based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

8        188.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market

9    through anticompetitive conduct described above, including, among other things, excluding

10   competitors by refusing to license its technology to them, engaging in exclusive dealing

11   arrangements with its customers to keep out competitors, and forcing OEMs to license its patent

12   portfolio, restraining and monopolizing the market for Relevant Cellular Devices. This affected the

13   sales of Relevant Cellular Devices within the intrastate commerce of in violation of N.H. Rev. Stat.

14   Ann. § 356:3, et seq.

15       189.    Members of the Classes were injured with respect to their purchases of Relevant

16   Cellular Devices in New Hampshire and are entitled to all forms of relief, including actual damages

17   sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and

18   injunctive relief.

19

20                          **SIXTEENTH CLAIM FOR RELIEF**

21                        **Violation of the New Mexico Antitrust Act,**

22                          **N.M. Stat. Ann. §§ 57-1-1, et seq.**

23                    **(On Behalf of the New Mexico Class Members)**

24       190.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

25   allegation set forth in the preceding paragraphs of this Complaint.

26       191.    The New Mexico Antitrust Act prohibits restraints of trade and monopolistic

27   practices. N.M. Stat. Ann. 57-1-2, et seq.

28

1

2

192.    Members of the Classes purchased Relevant Cellular Devices within the State of

New Mexico during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid

for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

193.    Under New Mexico law, indirect purchasers have standing to maintain an action

based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

194.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market

through anticompetitive conduct described above, including, among other things, excluding

competitors by refusing to license its technology to them, engaging in exclusive dealing

arrangements with its customers to keep out competitors, and forcing OEMs to license its patent

portfolio, thus restraining and monopolizing the market for Relevant Cellular Devices in New

Mexico in violation of N.M. Stat. Ann. § 57-1-2, et seq.

195.    Members of the Classes were injured with respect to purchases of Relevant Cellular

Devices in New Mexico and are entitled to all forms of relief, including actual damages, treble

damages, reasonable attorneys' fees, costs, and injunctive relief.

### SEVENTEENTH CLAIM FOR RELIEF

### Violation of Section 340 of the New York General Business Law

### (On Behalf of the New York Class Members)

196.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

197.    Article 22 of the New York General Business Law general prohibits monopolies and

contracts or agreements in restraint of trade, with the policy of encouraging competition or the free

exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen.

Bus. Law § 340(1).

198.    Plaintiff Thomas McManus and members of the Classes purchased Relevant

Cellular Devices within the State of New York during the Class Period. But for Qualcomm's

conduct set forth herein, the prices they paid for Relevant Cellular Devices would have been lower,

in an amount to be determined at trial.

199.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

200.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in New York. Qualcomm's conduct violated N.Y. Gen. Bus. Law § 340, et seq.

201.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## EIGHTEENTH CLAIM FOR RELIEF
### Violation of the North Carolina General Statutes,
### N.C. Gen. Stat. § 75-1, et seq.
### (On Behalf of the North Carolina Class Members)

202.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

203.    Qualcomm monopolized the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio, thus restraining and monopolizing the market for Relevant Cellular Devices in North Carolina. As a result, unlawful conduct substantially affected North Carolina's trade and commerce.

204.     As a direct and proximate cause of Qualcomm's unlawful conduct, Members of the Classes have been injured in their business or property and are threatened with further injury.

205.     By reason of the foregoing, Members of the Classes are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, et seq.

**NINETEENTH CLAIM FOR RELIEF**

**Violation of the North Dakota Uniform State Antitrust Act,**

**N.D. Cent. Code § 51-08.1, et seq.**

**(On Behalf of the North Dakota Class Members)**

206.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207.     The North Dakota Uniform State Antitrust Act generally prohibits monopolization of trade. N.D. Cent. Code § 51-08.1-03, et seq.

208.     Members of the Classes purchased Relevant Cellular Devices within the State of North Dakota during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid for Relevant Cellular Devices in North Dakota would have been lower, in an amount to be determined at trial.

209.     Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

210.     Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in North Dakota and artificially raising prices for Relevant Cellular Devices in North Dakota, in violation of N.D. Cent. Code §§ 51-08.1-03.

211.   Members of the Classes were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## TWENTIETH CLAIM FOR RELIEF

### Violation of the Oregon Antitrust Law,

### Or. Rev. Stat. § 646.705, et seq.

### (On Behalf of the Oregon Class Members)

212.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

213.   Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state," Or. Rev. Stat. § 646.715, in part by prohibiting monopolization of trade. Or. Rev., Stat. § 646.730.

214.   Members of the Classes purchased Relevant Cellular Devices within the State of Oregon during the Class Period. But for Qualcomm's conduct set forth herein, the prices the Members of the Oregon Class paid for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

215.   Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

216.   Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct described above, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular

Devices in Oregon and artificially raising prices for Relevant Cellular Devices in Oregon, in violation of Or. Rev. Stat. § 646.730, et seq.

217.    Members of the Classes were injured with respect to their purchases of Relevant Cellular Devices in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**TWENTY-FIRST CLAIM FOR RELIEF**

**Violation of the Rhode Island Antitrust Act,**

**R.I. Gen Laws § 6-36-1, et seq.**

**(On Behalf of the Rhode Island Class Members)**

218.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

219.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition, R.I. Gen. Laws § 6-36-2(a)(2), in part by prohibiting monopolies. R.I. Gen. Laws § 6-36-5.

220.    Members of the Rhode Island Class purchased Relevant Cellular Devices within the State of Rhode Island during the Class Period. But for Qualcomm's conduct set forth herein, the prices Members of the Rhode Island Class paid for their purchases of Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

221.    Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

222.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in

exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, thus restraining and monopolizing the market for Relevant Cellular Devices in Rhode Island and artificially raising prices for Relevant Cellular Devices in Rhode Island, for the purpose of excluding competition and/or maintaining or inflating prices paid for Relevant Cellular Devices in Rhode Island, all in violation of R.I. Gen. Laws § 6-36-1, 5, et seq.

223.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

## TWENTY-SECOND CLAIM FOR RELIEF
### Violation of the South Dakota Antitrust Statute,
### S.D. Codified Laws § 37-1-3.1, et seq.
### (On Behalf of the South Dakota Class Members)

224.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

225.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

226.    Members of the Classes purchased Relevant Cellular Devices in the State of South Dakota during the Class Period. But for Qualcomm's conduct set forth herein, the prices class members paid for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

227.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

228.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in

exclusive dealing arrangements with its customers to keep out competitors, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in South Dakota and artificially raising prices for Relevant Cellular Devices in South Dakota, in violation of S.D. Codified Laws § 37-1-3.2, et seq.

229.    Members of the Classes were injured with respect to their purchases of Relevant Cellular Devices in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**TWENTY-THIRD CLAIM FOR RELIEF**

**Claims Under Tennessee Law**

**Violations of the Tennessee Trade Practices Act**

**Tenn. Code Ann. §§ 47-25-101, et seq., and**

**The Tennessee Constitution, TN Const. Art. 1, § 22**

**(On Behalf of the Tennessee Class Members)**

235.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

236.    The Tennessee Trade Practices Act reflects a policy of prohibiting business arrangements that lessen competition and increase prices for goods sold in Tennessee. See Tenn. Code Ann. § 47-25-101. This prohibition on anticompetitive actions affecting commerce in the Tennessee reflects (in part) the Tennessee Constitution's prohibition of monopolies. TN Const. Art. 1, § 22.

237.    As noted above, Qualcomm had and used its monopoly power to effectively coerce its customers to agree to unreasonable terms of trade to obtain access to Qualcomm's technology. Despite its FRAND obligations, Qualcomm imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation and had those rates and other terms written into the terms of agreements between itself and its customers, forcing exclusive dealing arrangements and creating combinations that artificially prevented full and free

competition in the markets for goods and technology – Relevant Cellular Devices – delivered to and sold to the public in Tennessee.

238.    By using its market power to creating agreements designed to artificially inflate prices, Qualcomm established a unlawful and anticompetitive scheme that allowed it to acquire and maintain monopoly power, exclude competition and artificially inflate prices in the Modem Chipset Market and SEP Licensing Market, artificially raising prices for Relevant Cellular Devices sold to Class members in Tennessee.

239.    Members of the Classes purchased Relevant Cellular Devices in the State of Tennessee during the Class Period. But for Qualcomm's conduct set forth herein, the prices these class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

240.    As a direct and proximate result of Qualcomm's conduct, members of the Classes were injured with respect to their purchases of Relevant Cellular Devices in Tennessee and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief allowable under Tennessee law.

### TWENTY-FOURTH CLAIM FOR RELIEF

### Violation of the Utah Antitrust Act,

### Utah Code Ann. §§ 76-10-911, et seq.

### (On Behalf of the Utah Class Members)

230.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

231.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

232.    Plaintiff Chris Thompson and members of the Classes purchased Relevant Cellular Devices in the State of Utah during the Class Period. But for Qualcomm's conduct set forth herein, the prices class members paid for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

233.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

234.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Utah and artificially raising prices for Relevant Cellular Devices in Utah, in violation of Utah Code Ann. § 76-10-3104(2).

235.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

### TWENTY-FIFTH CLAIM FOR RELIEF

### Violation of the West Virginia Antitrust Act,

### W. Va. Code §47-18-1, et seq.

### (On Behalf of the West Virginia Class Members)

236.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

237.    Qualcomm's actions set forth above also constitute violations of section 47-18-4 of the West Virginia Code.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

238.   During the Class Period, Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in West Virginia and artificially raising prices for Relevant Cellular Devices in West Virginia, in violation of W. Va. Code § 47-18-4.

239.   Qualcomm's actions as described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

240.   As a direct and proximate result of Qualcomm's unlawful conduct, Members of the Classes have been injured in their business and property in that they paid more for Relevant Cellular Devices purchased during the class period in West Virginia than they would have paid in the absence of Qualcomm's unlawful conduct. As a result of Qualcomm's violation of Section 47-18-4 of the West Virginia Antitrust Act, members of the Classes seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

### TWENTY-SIXTH CLAIM FOR RELIEF

### Violation of the Wisconsin Antitrust Act,

### Wis. Stat. Ann. § 133.01(1), et seq.

### (On Behalf of the Wisconsin Class Members)

241.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242.   Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

243.    Members of the Classes purchased Relevant Cellular Devices in the State of Wisconsin during the Class Period. But for Qualcomm's conduct set forth herein, the prices class members paid for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

244.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

245.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Wisconsin and artificially raising prices for Relevant Cellular Devices in Wisconsin, in violation of Wis. Stat. § 133.03(2).

246.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for Relevant Cellular Devices than they should have.

247.    Accordingly, members of the Classes are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief available under Wisconsin law.

**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

248.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**TWENTY-SEVENTH CLAIM FOR RELIEF**

**Violation of the Arkansas Deceptive Trade Practices Act,**

**Ark. Code Ann. § 4-88-101, et seq.**

**(On Behalf of the Arkansas Class Members)**

249.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250.    Members of the Classes purchased Relevant Cellular Devices in Arkansas for personal, family, or household purposes. Were it not for Qualcomm's conduct, identified herein, members of the Classes would have and paid less for their Relevant Cellular Devices than they paid, in an amount to be determined at trial.

251.    Qualcomm maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Arkansas and artificially raised prices for Relevant Cellular Devices in Arkansas.

252.    Qualcomm's conduct was unfair, unconscionable, or deceptive.

253.    Qualcomm's conduct misled customers, withheld material facts, and substantially affected Arkansas's trade and commerce.

254.    Qualcomm's conduct was willful.

255.    As a direct and proximate cause of Qualcomm's unlawful conduct, members of the Classes have been injured in their business or property and are threatened with further injury.

256.    By reason of the foregoing, Qualcomm has violated Ark. Code Ann. § 4-88-101, et seq., and members of the Classes are entitled to seek all forms of relief, including actual damages plus reasonable attorney's fees under Ark. Code Ann. § 4-88-113.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### TWENTY-EIGHTH CLAIM FOR RELIEF

**Violation of the District of Columbia Consumer Protection Procedures Act,**

**D.C. Code § 28-3901, et seq.**

**(On Behalf of the District of Columbia Class Members)**

257.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.    Plaintiff Clarissa Simon and members of the Classes purchased Relevant Cellular Devices in the District of Columbia for personal, family, or household purposes.

259.    By reason of the conduct alleged herein, Qualcomm has violated D.C. Code § 28-3901, et seq.

260.    Qualcomm is a "merchant" within the meaning of D.C. Code § 28- 3901(a)(3).

261.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in the District of Columbia and artificially raising prices for Relevant Cellular Devices in the District of Columbia.

262.    Qualcomm engaged in the conduct identified herein for the purpose of excluding competition and raising prices for its technology.

263.    Qualcomm's conduct constitutes an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia substantially affecting the District of Columbia's trade and commerce.

264.    As a direct and proximate cause of Qualcomm's unlawful conduct, members of the Classes have been injured in their business or property and are threatened with further injury in the form of artificially inflated prices for their Relevant Cellular Devices.

265.     By reason of the foregoing, members of the Classes are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, et seq.

**TWENTY-NINTH CLAIM FOR RELIEF**

**Violation of the Florida Deceptive and Unfair Trade Practices Act,**

**Fla. Stat. § 501.201(2), et seq.**

**(On Behalf of the Florida Class Members)**

266.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

267.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

268.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

269.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

270.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("...anyone aggrieved by a violation of this [statute] may bring an action...").

271.     Plaintiffs Kendall Martin and Rodrigo Sapla and members of the Classes purchased Relevant Cellular Devices in the State of Florida during the Class Period. But for Qualcomm's conduct set forth herein, the prices class members paid for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

272.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Florida and artificially raising prices for Relevant Cellular Devices in Florida.

273.    Accordingly, Qualcomm's conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida substantially affecting Florida commerce.

274.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Classes have been injured in their business or property by virtue of overcharges for Relevant Cellular Devices and are threatened with further injury.

275.    By reason of the foregoing, members of the Classes  are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**THIRTIETH CLAIM FOR RELIEF**

**Claims Under Massachusetts Law**

**Violations of M.G.L.A. c. 93A, §§ 2, et seq**.

276.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

277.    Massachusetts' consumer protection laws prohibit unfair methods of competition, which includes violations of antitrust laws. *See* M.G.L.A. 93A § 2.

278.    Members of the Classes purchased Relevant Cellular Devices in the State of Massachusetts during the Class Period. But for Qualcomm's conduct set forth herein, the prices class members paid for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

279.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Massachusetts and artificially raising prices for Relevant Cellular Devices in Massachusetts.

280.    Accordingly, Qualcomm's conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Massachusetts substantially affecting Massachusetts commerce.

281.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Classes have been injured in their business or property by virtue of overcharges for Relevant Cellular Devices and are threatened with further injury.

282.    By reason of the foregoing, members of the Classes are entitled to seek all forms of relief, including injunctive relief pursuant to M.G.L.A. 93A § 9.

### THIRTY-FIRST CLAIM FOR RELIEF

**Violation of the Missouri Merchandising Practices Act,**

**Mo. Ann. Stat. § 407.010, et seq.**

**(On Behalf of the Missouri Class Members)**

283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

285.    Members of the Classes purchased Relevant Cellular Devices in the State of Missouri during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by

class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

286.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *See Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

287.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Missouri and artificially raising prices for Relevant Cellular Devices in Missouri, in violation of Mo. Ann. Stat. § 407.010, et seq.

288.    Members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief, available under the MMPA.

### THIRTY-SECOND CLAIM FOR RELIEF

### Violation of the Nebraska Consumer Protection Act,

### Neb. Rev. Stat. § 59-1602, et seq.

### (On Behalf of the Nebraska Class Members)

289.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

290.    By reason of the conduct alleged herein, Qualcomm has violated Neb. Rev. Stat. § 59-1602, et seq.

291.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among

other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Nebraska and artificially raising prices for Relevant Cellular Devices in Nebraska.

292.   Qualcomm's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska, substantially affecting Nebraska's trade and commerce and adversely affected the ability of Nebraska class members to protect themselves.

293.   Members of the Classes purchased Relevant Cellular Devices in the State of Nebraska during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

294.   As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Classes have been injured in their business or property and are threatened with further injury.

295.   By reason of the foregoing, the members of the Classes are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1614.

**THIRTY-THIRD CLAIM FOR RELIEF**

**Violation of the New Hampshire Consumer Protection Act,**

**N.H. Rev. Stat. Ann. Tit. XXXI, § 358-A, et seq.**

**(On Behalf of the New Hampshire Class Members)**

296.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

297.   Members of the Classes purchased Relevant Cellular Devices in the State of New Hampshire during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

298.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in New Hampshire and artificially raising prices for Relevant Cellular Devices in New Hampshire.

299.    Qualcomm's conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Hampshire, substantially affecting New Hampshire's trade and commerce and adversely affected the ability of New Hampshire class members to protect themselves.

300.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Classes have been injured in their business or property and are threatened with further injury.

301.    By reason of the conduct alleged herein, Qualcomm has violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, et seq.

302.    Qualcomm's unlawful conduct substantially affected New Hampshire's trade and commerce.

303.    By reason of the foregoing, the members of the Classes are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

**THIRTY-FOURTH CLAIM FOR RELIEF**

**Violation of the New Mexico Unfair Practices Act,**

**N.M. Stat. Ann. §§ 57-12-3, et seq.**

**(On Behalf of the New Mexico Class Members)**

304.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

305.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT

59

other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in New Mexico and artificially raising prices for Relevant Cellular Devices in New Mexico.

306.    Members of the Classes purchased Relevant Cellular Devices in the State of New Mexico during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

307.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Classes have been injured in their business or property and are threatened with further injury.

308.    Qualcomm's unlawful conduct substantially affected New Mexico's trade and commerce.

309.    Qualcomm's conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico class members and the price paid by them for Relevant Cellular Devices as set forth in N.M. Stat. Ann. § 57-12-2E.

310.    Qualcomm's conduct was willful, unfair, unconscionable, or deceptive. Thus, by reason of the conduct alleged herein, Qualcomm has violated N.M. Stat. Ann. §§ 57-12-3, and members of the Classes are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRTY-FIFTH CLAIM FOR RELIEF**

**Violation of the North Carolina Unfair Trade and Business Practices Act,**

**N.C. Gen. Stat. § 75-1.1, et seq.**

**(On Behalf of the North Carolina Class Members)**

311.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

312.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in North Carolina and artificially raising prices for Relevant Cellular Devices in North Carolina.

313.    Members of the Classes purchased Relevant Cellular Devices in the State of North Carolina during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

314.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Classes have been injured in their business or property and are threatened with further injury.

315.    Qualcomm's unlawful conduct substantially affected North Carolina's trade and commerce.

316.    Qualcomm's conduct was willful.

317.    Qualcomm's trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers. By reason of the conduct alleged herein, Qualcomm has violated N.C. Gen. Stat. § 75-1.1, et seq.

318.    Qualcomm's conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse

1    impact on the public at large, and harmed the public interest of North Carolina consumers in an

2    honest marketplace in which economic activity is conducted in a competitive manner.

3          319.    By reason of the foregoing, the members of the Classes are entitled to seek all forms

4    of relief, including treble damages under N.C. Gen. Stat. § 75-16.

5

6                          **THIRTY-SIXTH CLAIM FOR RELIEF**

7                   **Violation of the Oregon Unlawful Trade Practices Act,**

8                        **Or. Rev. Stat. § 646.605, et seq.**

9                      **(On Behalf of the Oregon Class Members)**

10         320.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

11   allegation set forth in the preceding paragraphs of this Complaint.

12         321.    Qualcomm established, maintained and used monopoly power in the Modem

13   Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among

14   other things, excluding competitors by refusing to license its technology to them, engaging in

15   exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to

16   license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices

17   in Oregon and artificially raising prices for Relevant Cellular Devices in Oregon.

18         322.    Members of the Classes purchased Relevant Cellular Devices in the State of Oregon

19   during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by class

20   members for their Relevant Cellular Devices would have been lower, in an amount to be

21   determined at trial.

22         323.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of

23   the Classes have been injured in their business or property and are threatened with further injury.

24         324.    Qualcomm's willful and unlawful conduct substantially affected Oregon's trade and

25   commerce.

26

27

28

1

2

3

325.    By reason of the conduct alleged herein, Qualcomm has violated Or. Rev. Stat. §
646.608, and members of the Classes are entitled to seek all forms of relief available under Or.
Rev. Stat. § 646.638.

4

5

326.    Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the
filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

6

7

8

9

10

### THIRTY-SEVENTH CLAIM FOR RELIEF

### Violation of the Rhode Island Deceptive Trade Practices Act,

### R.I. Gen. Laws § 6-13.1-1, et seq.

### (On Behalf of the Rhode Island Class Members)

11

12

327.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
allegation set forth in the preceding paragraphs of this Complaint.

13

14

15

16

17

18

328.    Qualcomm established, maintained and used monopoly power in the Modem
Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among
other things, excluding competitors by refusing to license its technology to them, engaging in
exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to
license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices
in Rhode Island and artificially raising prices for Relevant Cellular Devices in Rhode Island.

19

20

21

22

329.    Members of the Classes purchased Relevant Cellular Devices in the State of Rhode
Island for personal, family or household use during the Class Period. But for Qualcomm's conduct
set forth herein, the prices paid by class members for their Relevant Cellular Devices would have
been lower, in an amount to be determined at trial.

23

24

330.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of
the Classes have been injured in their business or property and are threatened with further injury.

25

26

331.    Qualcomm's willful and unlawful conduct substantially affected Rhode Island's
trade and commerce.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

332.    By reason of the conduct alleged herein, Qualcomm has violated R.I. Gen Laws § 6-13.1-1, et seq., and members of the Classes are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen Laws § 6-13.1-5.2.

<h3 style="text-align:center">THIRTY-EIGHTH CLAIM FOR RELIEF</h3>

**Violation of the Utah Unfair Practices Act,**

**Utah Code All. §§ 13-5-1, et seq.**

**(On Behalf of the Utah Class Members)**

333.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

334.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Utah and artificially raising prices for Relevant Cellular Devices in Utah.

335.    Plaintiff Chris Thompson and members of the Classes purchased Relevant Cellular Devices in the State of Utah during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

336.    As a direct and proximate cause of Qualcomm's unlawful conduct, the members of the Classes have been injured in their business or property and are threatened with further injury.

337.    Qualcomm's unlawful conduct substantially affected Utah's trade and commerce, was intended to and did substantially affect Utah's trade and commerce by suppressing or constituting unfair competition affecting Utah commerce.

338.    By reason of the conduct alleged herein, Qualcomm has violated Utah Code Ann. §§ 13-5-1, et seq.

339.    By reason of the foregoing, the members of the Classes are entitled to seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, et seq.

### THIRTY-NINTH CLAIM FOR RELIEF

### Violation of the Vermont Consumer Fraud Act,

### Vt. Stat. Ann. Tit. 9, §§ 2453, et seq.

### (On Behalf of the Vermont Class Members)

340.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

341.    Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, inter alia, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization which are prohibited under Vermont law because they are prohibited by the Federal Trade Commission Act. Vt. Stat. Ann. Tit. 9 § 2453(a), (b).

342.    Qualcomm established, maintained and used monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license its technology to them, engaging in exclusive dealing arrangements with its customers to reduce competition, and forcing OEMs to license its patent portfolio, restraining and monopolizing the market for Relevant Cellular Devices in Utah and artificially raising prices for Relevant Cellular Devices in Vermont.

343.    Members of the Classes purchased Relevant Cellular Devices in the State of Vermont during the Class Period. But for Qualcomm's conduct set forth herein, the prices paid by class members for their Relevant Cellular Devices would have been lower, in an amount to be determined at trial.

344.    As a direct and proximate cause of Qualcomm's unlawful conduct, members of the Classes have been injured in their business or property and are threatened with further injury.

345.    Qualcomm's unlawful conduct substantially affected Vermont's trade and commerce

346.    Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this Complaint. Vt. Stat. Ann. Tit. 9, § 2465(b).

347.    Because members of the Classes were injured with respect to purchases of Relevant Cellular Devices in Vermont, they are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees available under Vermont law.

## UNJUST ENRICHMENT

## FORTIETH CLAIM FOR RELIEF

### Unjust Enrichment

**(On Behalf of the Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin Class Members)**

348.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

349.    As a result of their unlawful conduct described above, Qualcomm has been and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of Relevant Cellular Devices.

350.    Under common law principles of unjust enrichment, Qualcomm should not be permitted to retain the benefits conferred on it by overpayments by Plaintiffs and members of the Classes in the following states: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada,

New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

## XIII.   REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes of all others so similarly situated, respectfully requests judgment against Qualcomm as follows:

1. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

2. The unlawful conduct, alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

3. Plaintiffs and the Classes recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Classes be entered against Qualcomm in an amount to be trebled to the extent such laws permit;

4. Qualcomm, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.   Plaintiffs and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

6.   Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

7.   Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: February 23, 2017                      By: ___/s/ Daniel Birkhaeuser_____
                                               Daniel E. Birkhaeuser, State Bar No. 136646
                                               **BRAMSON, PLUTZIK, MAHLER &**
                                               **BIRKHAEUSER LLP**
                                               2125 Oak Grove Rd., Suite 120
                                               Walnut Creek, CA   94598
                                               Tel: (925) 945-0200
                                               Fax: (925) 945-8792
                                               dbirkhaeuser@bramsonplutzik.com

                                               Timothy D. Battin
                                               Christopher V. Le
                                               Scott M. Dinner
                                               **STRAUS & BOIES, LLP**
                                               4041 University Drive, 5th Floor
                                               Fairfax, VA   22030
                                               Tel.: (703) 764-8700
                                               Fax: (703) 764-8704
                                               tbattin@straus-boies.com
                                               mschirmer@straus-boies.com
                                               cle@straus-boies.com

1

2   Paul F. Novak
    **WEITZ & LUXENBERG**
3   719 Griswold, Suite 620
    Detroit, MI  48226
4   Tel.: (313) 800-4166
    PNovak@weitzlux.com
5

6   Jeffrey A. Bartos
    **GUERRIERI, CLAYMAN, BARTOS,**
    **PARCELLI & ROMA, PC**
7   1900 M Street, NW Washington, DC   20036
    Tel.: (202) 624-7400
8   Fax:  (202) 624-7420
9   jbartos@geclaw.com

10  Marc G. Reich, State Bar No. 159936
    **REICH RADCLIFFE & HOOVER LLP**
11  4675 MacArthur Court, Suite 550
    Newport Beach, CA  92660
12  Tel.: (949) 975-0512
    mgr@reichradcliffe.com
13

14

15  Abbas Gokal, State Bar No. 264653
    Alison Gokal, State Bar No. 257541
    **GOKAL LAW**
16  101 Pacifica, Suite 100
    Irvine, CA  92618
17  Tel.: (949) 753-9100
    Fax: (866) 610-9381
18  agokal@gokallaw.com
19  alisongokal@gmail.com

20          *Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS, STATE UNFAIR
COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT            69